IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01748-PSF-MJW

DANIEL L. SCHAAL,

Plaintiff,

v.

JUDY FENDER, et al.,

Defendants.

---

**RECOMMENDATION ON
PLAINTIFF'S LETTER MOTIONS FOR INJUNCTIVE RELIEF
(Docket Nos. 42, 43, and 47)**

---

**MICHAEL J. WATANABE
United States Magistrate Judge**

This case is before this court pursuant to an Order of Reference to United States

Magistrate Judge issued by District Judge Philip S. Figa on November 2, 2006 (Docket

No. 15).

**Plaintiff's Allegations in the Amended Prisoner Complaint**

The pro se plaintiff is a pretrial detainee at the El Paso County Judicial Center

("EPCJC") who brings this action pursuant to 42 U.S.C. § 1983.  In his Amended

Prisoner Complaint (Docket No. 6), plaintiff alleges the following.  He was assaulted by

another inmate at EPCJC on March 12, 2006, and taken to the infirmary where he sat

for 30 minutes before he was seen by medical staff for injuries to his face, ankle, and

foot.  Defendant Jensen examined plaintiff, opined that he was probably just suffering

from a sprain, wrapped his ankle and foot with an ace wrap, and told plaintiff that he

would be scheduled to have x-rays done the following day.  Plaintiff told her his foot

had twisted completely sideways, and he believed he needed to be taken to the

hospital.  She responded that the following day plaintiff would be examined by the

doctor, who would be the one to determine whether outside care was needed.  Since

plaintiff had walked on his ankle to get to the infirmary, Jensen opined that the injuries

were not so serious where plaintiff should be taken to outside care.  By the time he left

the infirmary, plaintiff's foot was unbearable to stand on, and he felt something popping

inside of his ankle.  Plaintiff was given crutches to use until he returned to his ward.

Jensen did not give plaintiff the proper slips needed to keep the crutches, so he was

forced to walk on his ankle.

The following day, about 24 hours later, he was x-rayed and told that he would

be notified within a day or two of the results.  Around two hours later, he was contacted

that the x-rays showed that his leg was broken.  A person from the medical staff

brought plaintiff an ice pack and told him that his leg was broken and would have a cast

put on it in a few days, depending on the swelling.  The following day, he was put in a

soft cast and was told that as soon as some of the swelling went down, he would be put

in a cast, and that he could stand on his foot to shower and use the restroom.  At that

time, plaintiff showed the doctor his upper abdomen and explained how it was getting

bigger and hurting and that plaintiff was afraid it would get worse if he had to rely on

crutches to walk.  The doctor gave plaintiff two ace wraps to wrap around himself.

Three weeks later, more x-rays were taken.  Two days later he was told that he

had been misinformed about his injuries and that he actually sustained injuries to the

"main bone in [his] leg as well." (Docket No. 6 at 9). Plaintiff still did not receive the promised cast. The physician assistant told plaintiff to stay off his foot completely, and plaintiff was informed that he would be referred to an outside doctor to discuss surgery because his injuries were only getting worse.

Plaintiff was seen by an outside doctor, Dr. Shaw, on May 22, 2006, who could not read the plaintiff's x-rays, which had been dropped during transport. The doctor thus had no records to reflect plaintiff's declining condition, and the doctor took more x-rays of plaintiff's ankle. Plaintiff was removed from his wheelchair and placed in a boot. Seven days later, plaintiff started to lose feeling in his ankle and foot and started feeling an intermittent burning sensation in his leg.

As of the date of the Amended Complaint, plaintiff had seen the doctor at EPCJC just the one time. Although plaintiff was told he was going to be in the boot for a period of just six to eight weeks, he was in his second boot after the soles of the first became worn. Plaintiff still had "mass swelling" over his ankle and foot.

On July 6, 2006, plaintiff was once again transported to see Dr. Shaw, who again had x-rays taken of plaintiff's ankle and foot. Dr. Shaw informed plaintiff that plaintiff had an extremely bad case of arthritis in his ankle due to the injuries and that plaintiff had no choice but to have surgery in the future.

Plaintiff had also suffered a broken nose during the assault, which caused his vision to decrease. Plaintiff has put in numerous "kites" concerning his inability to breathe as easily as well as about his eye sight. Nevertheless, plaintiff's nose was examined only once, and he was informed that his nostril passages were swollen. The

4

physician assistant ("PA") prescribed an optional allergy medication, which caused

plaintiff to have nose bleeds.  During plaintiff's next visit to the medical department, he

brought this to the PA's attention, but his complaints were ignored, as was his vision

loss.

Pursuant to an Order issued by Senior Judge Zita L. Weinshienk (Docket No.

12; Schaal v. Correctional Healthcare Management, 2006 WL 3054015 (D. Colo. Oct.

26, 3006)), four defendants remain in this action, namely, Judy Fender; "Jensen,"

Medical Assistant; "Turk," Medical Assistant; and Ron Johnson, PA.  As a result of this

order, only the following four of five claims remain.[1]  First, plaintiff contends that the

delayed care of his ankle injuries has resulted in permanent damage.  Second, he

complains about being denied the opportunity to obtain outside care during the first few

months.  Third, he complains of "Medical assistant Turk, the total unprofessionalism,

and choice of ignoring the proper care I need."  (Docket No. 6 at 19).  He asserts that

when he was examined by defendant Turk, she claimed she did not see any swelling,

which was false, and plaintiff states that he "was asking to be seen by a Doctor to try

and understand why I was suffering from so much swelling as well as my problems I

was having breathing which was totally ignored."  (Docket No. 6 at 19).  Fourth, plaintiff

complains that he was given medication for his swollen nostril passages that only

caused him more health problems instead of helping him.  Plaintiff asserts that he

needed to be seen by a professional in the field of his injuries concerning his nose and

---

[1]The fifth claim for relief (Docket No. 6 at 21) against Dave Gilbert, the state court judge presiding over plaintiff's criminal cases, was dismissed by Judge Weinshienk for lack of personal participation.  (Docket No. 12).

5

eyes, but instead he was ignored and given the wrong medication.  Plaintiff seeks

monetary relief.

**Plaintiff's Letter Motions for Injunctive Relief**

Now before the court are a series of three letters from plaintiff (Docket Nos. 42,

43, and 47) which have been construed as motions for injunctive relief.  On March 19,

2007, this court conducted a hearing on these letter motions at which plaintiff and

defense counsel appeared in person.  Plaintiff testified on his own behalf.  Testimony

was also heard from two defense witnesses, defendant Judy Ann Fender and Dr. Diane

Al-Abduljalil, and defendants had two exhibits admitted into evidence (Defendants' Ex.

A - plaintiff's medical record at EPCJC;  and Ex. B - an incident report).  The court then

heard argument from plaintiff and counsel for defendants.  The court has considered

the letter motions, the evidence and testimony from the hearing, the arguments made at

the hearing, the court's file, and applicable Federal Rules of Civil Procedure and case

law.  The court now being fully informed makes the following findings of fact,

conclusions of law, and recommendation that the letter motions for injunctive relief be

denied.

In his first letter motion, dated February 17, 2007, plaintiff asserts the following.

He was assaulted again by another inmate on the evening of February 11, 2007, when

he was struck in the back of his head with a food tray.  Deputy Smith took plaintiff to the

infirmary.  One of the two nurses on duty (who was the same nurse who saw his leg

injury on March 12, 2006) was busy moving something, and once she recognized the

plaintiff, she asked the other nurse to look at plaintiff.  The other nurse sat plaintiff

6

down and looked at his head.  She did not see any open wounds but did see a big red

area forming on his head as well as a good-sized lump on the back right side.  She

took plaintiff's vital signs and asked if the plaintiff was taking any medications.  Plaintiff

responded that he was taking Tylenol and Motrin.  The nurse then brought plaintiff a

Motrin and a Tylenol and told plaintiff he could take them at that time but he then would

not be able to take them at the "med pass."  Plaintiff responded that he could not take

the Motrin without Zantac, and the nurse said plaintiff would have to wait until med pass

to take the Zantac.  She refused to give plaintiff the Zantac at that time.  Therefore,

plaintiff informed her that he would wait until med pass for all of it.  Plaintiff also told her

that his "neck was hurting real bad, on a scale of one to ten, one being minimum, ten

being maximum, [he] was feeling pain at a ten" (Docket No. 42 at 2), but nothing else

was done, and plaintiff was sent back to his ward.  He was not followed up by a visit to

see a doctor, x-rays, or any other care.  The following day he discovered he was

charged $8.00 for the care he did not receive.

Plaintiff believes he is "purposely being denied any form of care at all."  (Docket

No. 42 at 2).  He claims defendants are refusing to answer his "kites" and that he has

had no follow-up visits on his ankle since he saw Dr. Shaw.  He states that he has

severe headaches throughout the day and still finds himself disoriented at times with no

explanation.  He asks "the courts to see this deliberate attempt of refusing any kind of

care and order an emergency injunction as to allow me the right to seek care outside of

C.J.C."  (Docket No. 42 at 2) (original all in capital letters).

Plaintiff's second letter motion (Docket No. 43) was written ten days later.

Plaintiff claims therein that he still had not seen a doctor since his assault on February 11, 2007. He asserts that he is "now getting so sick 'without' care I am unable to barely help myself." (Docket No. 43 at 2. He asks the court "to see this torture of cruel and unusual punishment going on" and "to step in and allow me medical care. Please order me to the hospital? I need care Your Honor. Medical care!" (Docket No. 43 at 2-3). Plaintiff further asks the court "to recognize the only care givers I have access to are/is the very company who is refusing to care for me due to this pending case." (Docket No. 43 at 3).

Plaintiff's third letter motion apparently was written on March 1, 2007 (Docket No. 47). In that document, plaintiff complains that as of that date the medical department still had not answered any of his kites or allowed him any care at all. He contends that that afternoon a nurse wanted him to sign a medical refusal slip for a 2:00 appointment that day that he knew nothing about until he was asked to sign the form. Plaintiff believes "that now that because I have asked the Courts to allow me outside care from them that they are trying to make up appointments and times that have never existed before then go as far as trying to have me sign a refusal . . . ." (Docket No. 47 at 3). Plaintiff asks "the courts to allow me outside care. C.H.M. has shown prejudice involving any care for me here. . . ." (Docket No. 47 at 6).

"Issuance of a temporary restraining order ["TRO"] is subject to the court's discretion. . . . Where the opposing party has notice, the procedure and standards for issuance of a [TRO] mirror those for a preliminary injunction." Stine v. Wiley, 2007 WL 201251, *1 (D. Colo. Jan. 24, 2007). A preliminary injunction application requires:

8

(1) the movant will suffer irreparable harm unless the injunction issues;

(2) there is a substantial likelihood the movant ultimately will prevail on the merits;

(3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and

(4) the injunction would not be contrary to the public interest.

Id. (quoting ACLU v. Johnson, 194 F.3d 1149, 1155 (10th Cir. 1999)).

"Under the Fourteenth Amendment's due process clause, pretrial detainees . . . are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment.  Thus, [a pretrial detainee's] inadequate medical attention claim must be judged against the 'deliberate indifference to serious medical needs' test of *Estelle v. Gamble*, 429 U.S. 97, 104 . . . ." Frohmader v. Wayne, 958 F.2d 1024, 1028 (10th Cir. 1992) (citation omitted).  There is a two-pronged inquiry when considering a deliberate indifference claim - an objective and subjective component.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  "Under the objective inquiry, the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension. . . .  In addition, under the subjective inquiry, the prison official must have a 'sufficiently culpable state of mind.'" Self v. Crum, 439 F.3d 1227, 1230-31 (10th Cir.), cert. denied, 127 S.Ct. 131 (2006).  "[A] prison official cannot be liable 'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 1231 (quoting Farmer 511 U.S. at 837).

9

Here, based upon the plaintiff's medical records and the testimony at the hearing, including that of the plaintiff himself, this court finds that the plaintiff has failed to establish likelihood of success of the merits of his deliberate indifference claim.  In particular, the subjective component has not been met.  It is readily apparent that this is simply a case where the plaintiff disagrees with the treatment offered.

The records reflect, and plaintiff testified, that he was seen by medical staff right after both assaults.  After the first assault, plaintiff was taken to the infirmary where he was seen by a nurse who provided medication, scheduled plaintiff for x-rays, and scheduled him for follow-up.  After the x-ray results were received, plaintiff was seen by Dr. Abduljalil who issued orders for treatment, namely, a splint, pain medication, medications to help nausea that could result, ice packs, a pillow for elevation, and a wheelchair as needed.  She further scheduled a follow-up for casting, but the leg was ultimately never casted because of concern about the swelling in plaintiff's leg, his size, and his decreased mobility.  Plaintiff was followed with serial x-rays to see how the fracture was healing.  In addition, plaintiff has received numerous, regular follow-ups for his fractured ankle (see, e.g., Def.'s Ex. A at CHM 57, 61, 68, 82, 94, 105, 114, 120, 130) and has even been referred to and seen by an outside orthopedic specialist, Dr. Shaw, on three occasions.  The most recent visit occurred following a request by defendant Johnson and was scheduled earlier than recommended by Dr. Shaw himself.

Dr. Shaw's report from the first visit on May 22, 2006, stated after physical examination that "[t]he right ankle has **mild swelling**.  There is **mild tenderness**.  **No deformity**.  Neurovascular of toes intact.  He is able to fully flex and extend all digits."

(Def.'s Ex. A at CHM 52) (emphasis added).  The doctor's impression was "**[h]ealing right ankle bimalleolar fracture in good alignment**."  (Def.'s Ex. A at CHM 52) (emphasis added).  The plan was "[f]racture walker brace to be used for six weeks and HEP reviewed for out of brace several times a day.  Discharge."  (Def.'s Ex. A at CHM 52).  This treatment plan was followed at EPCJC.

Dr. Shaw next saw the plaintiff on July 6, 2006, and his reported diagnosis was "1.  **Healing fracture without complications**.  2.  **Significant degenerative arthritis, right ankle, complicated by morbid obesity and fracture**."  (Def.'s Ex. A at CHM 71) (emphasis added).  The doctor's plan was "[d]ischarged with prescription for a new boot and a functional brace, which he is to alternate.  He may need a functional brace permanently.  He should wear one or the other at least full time for the next two to three months."  (Def.'s Ex. A at CHM 71).  The doctor made no mention of the need for a fusion.  In addition, the doctor did not indicate when or if he wanted to see the plaintiff for a follow-up.  Instead, as noted above, he indicated that the plaintiff was "discharged."  Following the visit, EPCJC once again followed the doctor's treatment plan and continued to monitor the plaintiff.

In mid-November 2006, Dr. Shaw's office faxed a note to the EPCJC's medical department that "[Patient] needs to wear this brace for 6 mos.  If no improvement Dr. Shaw will see him then."  (Def.'s Ex. A at CHM 96).  Similarly, a note in the file dated November 14, 2006, states:

> PHYSICIAN AT THE JAIL WANTED DANIEL'S ANKLE RECHECKED.
> SCHEDULED FOR 11/15 - DR SHAW SAID IT WAS NOT NECESSARY
> FOR HIM TO SEE HIM AGAIN AT THIS TIME AS IT WOULD BE OF NO

11

> BENEFIT TO THE PT.  HE WROTE A RX FOR AN ARIZONA BRACE
> WITH INSTRUCTIONS TO WEAR IT FOR 6 MONTHS.  IF NO
> IMPROVEMENT AT THAT TIME HE WILL SEE THE PT AGAIN.

(Def.'s Ex. A at CH M 98).  Nevertheless, on December 6, 2006, at plaintiff's request,

defendant Johnson sent a note to Dr. Shaw, asking that the doctor reconsider the

request for a follow-up with the patient and/or schedule for surgery as soon as possible.

(Def.'s Ex. A at CHM 107-09).  Plaintiff was then seen by Dr. Shaw for a third time on

January 11, 2007.  The doctor's report of that visit includes the following:

> Today he is repeatedly and persistently requesting his ankle to be fused.  **I
> explained that he was not a candidate for fusion at this time** and then
> evaluated him.
>
> **PHYSICAL EXAMINATION:** The patient is significantly overweight (he
> estimates his weight at 320 pounds). . . .  The boot was removed from the
> right leg and he has very impressive woody edema from about the mid leg
> down to his toes.  The posterior skin is particularly indurated.  There is
> some overlying, **mild**, eczematous type of changes.  No infection.  He has
> over 50% active ankle motion with no apparent discomfort and no crepitus.
> There is no ankle instability to anterior drawer or inversion stress.  No
> syndesmosis instability to external rotation.  He has no tenderness about
> the ankle, leg or foot.  The skin is intact except for some **superficial**
> excoriations posteriorly.  Pulses are not palpable but he has brisk refill in
> all toes.  There is a sharp demarcation of the edema, which corresponds to
> the proximal strap on the brace.  He has normal knee with full motion.
> Light touch sensation is intact on the dorsal and plantar surfaces of the
> foot and there are no foot erosions or ulcerations. No ingrown toenails.
>
> **IMAGING: X-ray:** Three (3) views of the right ankle show a **healed, lateral
> malleolus fracture and a small, healed, posterior malleolus fracture**.
> **The joint space and mortise are fairly well preserved with some mild
> to moderate degenerative changes present**.  On the lateral view, the
> talus looks a little bit shortened and sclerotic, which may be suggestive of
> AVN or simply the overlying shadow of the lateral malleolus.
>
> **IMPRESSION: Unusual, persistent, woody edema of right leg, foot,
> and ankle following a healed, nondisplaced, lateral and posterior
> malleolus fracture with good alignment and no deformity.  Mild,**

12

**degenerative ankle arthritis**.

**PLAN: I carefully explained to this patient, that I wasn't at all sure that his ankle joint was the source of the problem.  I explained that this type of edema was very unusual this late following an ankle fracture, or in fact, anytime after an ankle fracture.  I also explained that I wasn't sure that his ankle was the source of his pain.  However, I simply was not able to convince him that an ankle fusion at this time was not in his best interest.**

**I recommended and wrote prescriptions for a new fracture walker brace, an MRI of the entire leg, ankle and foot, and a sequential venous compression device (AV pulse) to be applied daily at the infirmary.  <u>Following this, he stated he was no longer interested in pursuing care with me and would not comply with any of these recommendations.</u>**  Additionally, I offered to perform a steroid injection into the ankle joint along with Marcaine for diagnostic, and possibly therapeutic purposes, and **<u>again he stated he only wanted his ankle fused and did not want any other intervention</u>.**  At this point my staff asked him to sign a refusal of care form and he was formally discharged from this practice.  I explained that I would be happy to transfer, at no charge, copies of his records and films to whomever he designated as a treating physician.

(Def.'s Ex. A at CHM 123-24) (emphasis added).  There is no indication in this report

that Dr. Shaw suggested that a second opinion be obtained.

Dr. Al-Abduljalil testified that she discussed Dr. Shaw's recommendation with the

plaintiff, but plaintiff was not interested and wanted an ankle fusion, which Dr. Shaw

thought was not warranted at that time.  In addition, on January 31, 2007, defendant PA

Johnson saw the plaintiff and discussed his right ankle and Dr. Shaw's report and also

discussed plaintiff's high blood pressure.  (Def.'s Ex. A at CHM 130).

With regard to the assault on February 11, 2007, the nurse's note states:

Slight swelling noted to top right side back of head.  No bleeding or bruising noted.  Slight redness.  Offered inmate his Tylenol and Motrin but inmate verbally refused till evening med pass.  Vitals taken with normal

13

> readings.  Inmate instructed to kite PRN [as needed/necessary] with
> problems.

(Def.'s Ex. A at CHM 178).  As pointed out by defendant Fender, there is no indication in

the note that additional treatment was necessary.  Furthermore, although plaintiff

testified that his neck and teeth hurt at that time, the nurse's note does not indicate such

complaints.  The method of record keeping used at the facility by medical staff, called

"charting by exception," would have included such complaints had they been made at

that time.  On cross-examination, plaintiff testified that after the assault he had no open

wounds, was not bleeding, was conscious, knew who he was and where he was, could

answer questions, was not vomiting, could move his arms and legs, and could walk to

the clinic.  The nurse took his vital signs, asked what medications plaintiff was taking,

and offered Motrin and Tylenol.  X-rays were taken the following day.

Both defendant Fender and Dr. Al-Abduljalil testified that plaintiff was provided

appropriate care for this injury.  The doctor opined at the hearing that it did not appear

to be a serious injury.

According to defendant Fender, the day after that assault, plaintiff was scheduled

to have a doctor appointment for hypertension (high blood pressure),[2] during which time

plaintiff would also have been seen for his head injury, but plaintiff refused the visit.

While plaintiff claims that he was unaware of the appointment, this court does not find

---

[2]From plaintiff's testimony, it appears that he misunderstands the meaning of
hypertension since he seemed to equate it to his ankle condition.

14

plaintiff's testimony on this point to be credible.[3]

Plaintiff also refused a follow-up visit on March 1, 2007.  His medical records include a notation that a nurse "called 2D1 spoke [with] Deputy Horton who took the cordless phone over and asked Mr. Schall do you want to go see the Dr and this nurse could clearly here [sic] pt state "NO"  I do not want to go."  (Def.'s Ex. A at CHM174). Plaintiff testified that he has not submitted any more "kites" since March 1, 2007.  He figured he would let the court handle it.  He was, however, instructed at the first visit to submit kites as needed.

In sum, this court agrees with defendants' argument in closing that this is a classic case of a patient wanting to be the doctor and demand specific treatment. Plaintiff has made no showing of deliberate indifference to a serious medical need.  The evidence provided in this case does not support plaintiff's assertion that he has been denied care.  Instead, he has been seen numerous times by medical personnel for his various conditions and has even been seen by an outside specialist on three occasions. The evidence shows that plaintiff merely disagrees with the care provided and/or recommended and has thus chosen to refuse care, not submit additional "kites" seeking medical care at the facility, and put the matter into the court's hands.   Plaintiff is firmly convinced that his ankle must be fused, but even the outside orthopedic surgeon does not believe that plaintiff is a candidate for such surgery at this time.  In fact, that doctor is of the opinion that plaintiff's ankle joint may not be the source of plaintiff's problem,

---

[3]Plaintiff repeatedly testified about the erroneous $8.00 charge for this visit, but this court finds that that clerical error is irrelevant.  Defendant Fender testified that she requested a refund for that charge.

15

yet plaintiff refuses to follow that specialist's recommended course of action, including

an MRI, and instead asks that this court direct the defendants to send him to another

outside specialist.  It is well established, however, that "a prisoner who merely disagrees

with a diagnosis or a prescribed course of treatment does not state a constitutional

violation . . . absent evidence the prison official 'knew about and disregarded a

'substantial risk of harm' to [the prisoner's] health or safety."   Self v. Crum, 439 F.3d at

1231 (quoting Oxendine v. Kaplan, 241 F.3d 1272, 1277 & n.7 (10th Cir. 2001)).  "[T]he

subjective component is not satisfied, absent an extraordinary degree of neglect, where

a doctor merely exercises his considered medical judgment." Id. at 1232.  The Tenth

Circuit has rejected an expansive view of the rights protected by the Eighth Amendment

that would permit an inmate to have a right to a particular course of treatment.  Callahan

v. Poppell, 471 F.3d 1155, 1160 (10th Cir. 2006).  See Perkins v. Kansas Dep't of Corr.,

165 F.3d 803, 811 (10th Cir. 1999).

Furthermore, under the circumstances presented here, plaintiff's refusal to accept

a certain course of medical treatment does not constitute an Eighth Amendment

violation by the defendants.  See Carter v. Troutt, 175 Fed. Appx. 950 (10th Cir. Apr. 7,

2006) (No Eighth Amendment violation by prison doctor who refused to prescribe a

certain pain medication where he prescribed other medications for the prisoner, prisoner

missed his follow-up appointment for treatment, and he refused to be examined unless

he was prescribed the pain medication he wanted.  Doctor monitored prisoner and his

health situation and provided ongoing-care, albeit not the care the prisoner desired);

Mosley v. Snider, 10 Fed. Appx. 663 (10th Cir. Mar. 22, 2001) (Inmate did not state an

16

Eighth Amendment claim based upon his allegations that his prescription was discontinued because facility physician determined it was no longer needed, a different medication was prescribed but the inmate refused to accept it, and the inmate then missed his next three medical appointments.); Olson v. Coleman, 993 F.2d 1551 (Table) (10th Cir. Apr. 28, 1993) (Plaintiff's claims of denial of medical care must fail in light of testimony that plaintiff refused medical care while at the correctional facility.); Ledoux v. Davies, 961 F.2d 1536 (10th Cir. 1992) (No merit to arguments concerning defendants' alleged deliberate indifference to medical needs because plaintiff's belief that he needed additional medication, other than that prescribed by the treating physician, as well as his contention that he was denied treatment by a specialist is insufficient to establish a constitutional violation.).

In conclusion, this court finds that the plaintiff has not shown a likelihood of success on the merits and recommends that his motions for injunctive relief be denied.

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that plaintiff's three letter motions for injunctive relief (Docket Nos. 42, 43, and 47) be **DENIED**.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have ten (10) days after service of this recommendation to serve and file written, specific objections to the above recommendation with the District Judge assigned to the case.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge,**

**Fed. R. Civ. P. 72(b), <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.  <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

BY THE COURT:

Date: March 26, 2007          s/Michael J. Watanabe_____
     Denver, Colorado          MICHAEL J. WATANABE
                                United States Magistrate Judge