IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 06-cv-01748-PSF-MJW

DANIEL L. SCHAAL,

Plaintiff,

v.

JUDY FENDER, Administrative Coordinator;
JENSEN, Medical Assistant;
TURK, Medical Assistant; and
RON JOHNSEN, Physician Assistant,

Defendants.

---

**ORDER ON PENDING MOTIONS**

---

This matter is before the Court on the Recommendation of United States Magistrate Judge (Dkt. # 55), filed on March 26, 2007, in which the Magistrate Judge recommended that three letter motions for preliminary injunctive relief (Dkt. ## 42, 43, 47) filed by plaintiff on February 22, March 1, and March 7, 2007, respectively, be denied. Plaintiff Daniel Schaal timely filed an Objection to the Recommendation on April 4, 2007 (Dkt. # 56). Also pending before the Court is an additional motion for preliminary injunctive relief entitled “Motion Asking for Courts to Allow Physical Examination from an Outside Entity (Hospital)” (Dkt. # 60), filed by plaintiff on May 16, 2007. The objection and motion are fully briefed and ripe for disposition. Having reviewed the Recommendation, the evidence and testimony presented at the hearing

held by the Magistrate Judge, the parties' submissions, and the applicable law, the Court enters the following Order.

## I. BACKGROUND

### A. Complaint Allegations

On August 28, 2006, plaintiff, a pretrial detainee at the El Paso County Judicial Center ("EPCJC"), filed this action *pro se* under 42 U.S.C. § 1983, complaining of the medical care he has received while housed at the facility. The Magistrate Judge's Recommendation contains a detailed and accurate summary of the allegations in plaintiff's amended complaint (Dkt. # 6). Briefly, the general allegations revolve mainly around the treatment plaintiff received for injuries he sustained after being assaulted by another inmate on March 12, 2006, as well as the treatment of plaintiff's hernia, a condition he had upon his arrival at the facility in late 2005. As to the assault, which resulted in injuries to his face, ankle, and foot, plaintiff alleges as follows: he waited 30 minutes in the infirmary before being seen; he was not taken to a hospital or allowed to see a doctor that day; x-rays were taken the following day showing his leg was broken; x-rays were taken three weeks later showing his injuries were getting worse; he saw an outside doctor on May 22 and July 6, 2006 and was told he had arthritis and needed surgery; he has never received a cast for his leg and was given only temporary boots to wear; his medical "kites" (requests for medical care) complaining of a broken nose suffered during the assault and a corresponding decrease in vision and difficulty breathing have been ignored; and the medication provided for his problems has caused nose bleeds. *See generally* Am. Compl. at 7–12. Plaintiff also alleges that, when he

saw the EPCJC doctor the day after the assault, he complained his upper abdomen was getting bigger and hurting, and the doctor gave him two ace wraps. *Id.* at 8.

Plaintiff brings four claims against Defendants Judy Fender, EPCJC's Health Services Administrator; "Jensen," a nurse at EPCJC; "Turk," also a nurse at EPCJC; and Ron Johnsen, PA, a physician's assistant at EPCJC. These claims are based on (1) the alleged delay in caring for plaintiff's injuries immediately following the assault; (2) the alleged denial of outside care during the first few months after his injury; (3) the care plaintiff received immediately after the assault from Defendant Turk, who allegedly prevented plaintiff from seeing a doctor and ignored his breathing problems; and (4) plaintiff's alleged receipt of improper medication for his swollen nasal passages. *Id.* at 15, 17, 19–20. Plaintiff seeks only monetary relief in his complaint.

**B. Plaintiff's First Three Motions for Preliminary Injunctive Relief**

On February 22, 2007, plaintiff filed the first of three letters, liberally construed by the Court as motions for injunctive relief, requesting that he be allowed to seek outside medical care. In the first motion (Dkt. # 42), plaintiff asserts another inmate struck him in the back of the head with a food tray on the evening of February 11, 2007, and he was taken to the infirmary. Pl.'s First Mot. at 1. A nurse took his vital signs, examined him, and told him she "did not see any open wounds, but did see a big red area" on his head along with a "good size lump." *Id.* at 2 (original in all caps). Plaintiff states the nurse offered him Tylenol and Motrin, but he refused because the nurse would not let him take Zantac, which plaintiff claims he is required to take with Motrin. *Id.* Plaintiff also contends he complained of severe pain in his neck, but "nothing else

was done," and he received no follow-up care such as a doctor's visit or x-rays. *Id.* The next day, plaintiff discovered he had been charged $8.00 "for the care [he] did not receive." *Id.* Plaintiff contends his kites, including one he submitted on February 12, 2007, have been ignored, he has had no follow-up visits for his head injury, and he has had no follow-up visits for his ankle since January 11, 2007. *See id.* at 3. He asks the Court to "order an emergency injunction . . . to allow me the right to seek care outside of [EPCJC]." *Id.*

Plaintiff's second motion (Dkt. # 43), filed less than two weeks after the first, essentially contains an update of plaintiff's condition. Plaintiff states that as of February 27, 2007, he still had not seen a doctor since the February 11, 2007 assault and that he was "getting so sick 'without' care I am unable to barely help myself." Pl.'s Sec. Mot. at 2. He asks the Court "to see this torture of cruel and unusual punishment going on," and "to step in and allow me . . . emergency care." *Id.* at 2–3.

In plaintiff's third motion (Dkt. # 47), apparently prepared by plaintiff on March 1, 2007, plaintiff asserts that until that date the medical department had not answered any of his kites or provided any care in relation to the injuries he sustained on February 11, 2007. Pl.'s Third Mot. at 1. He contends that on the afternoon of March 1st, a nurse wanted him to sign a medical refusal slip for a 2:00 appointment he had missed, but that he did not know about the appointment until he was asked to sign the slip. *Id.* at 1–2. Plaintiff believes that "because I have asked the Courts to allow me outside care," the EPCJC medical department is "trying to make up appointments and times that have never existed before, then go as far as trying to have me sign a refusal of an

appointment I did not know existed until after the fact." *Id.* at 3. Plaintiff again requests that the Court allow him "outside care." *Id.* at 6.

**C. The Magistrate Judge's Recommendation**

The Magistrate Judge held an evidentiary hearing on plaintiff's motions on March 19, 2007 and subsequently issued a recommendation that all three motions be denied, concluding that plaintiff had failed to establish a likelihood of success on the merits of his claims for inadequate medical care. Rec. at 9. Specifically, the Magistrate Judge found plaintiff had failed to establish that any prison officials had acted with deliberate indifference to plaintiff's medical needs. *Id.* According to the Magistrate Judge, the evidence shows plaintiff "has been seen numerous times by medical personnel for his various conditions and has even been seen by an outside specialist on three occasions." *Id.* at 14.

With regard to plaintiff's treatment immediately after the assault in March 2006 and the ongoing treatment of plaintiff's foot and ankle, the Magistrate Judge found:

> The records reflect, and plaintiff testified, that he was seen by medical staff right after [the] assault[]. . . . [P]laintiff was taken to the infirmary where he was seen by a nurse who provided medication, scheduled plaintiff for x-rays, and scheduled him for follow-up. After the x-ray results were received, plaintiff was seen by Dr. Abduljalil [the doctor at EPCJC] who issued orders for treatment . . . . She further scheduled a follow-up for casting, but the leg was ultimately never casted because of concern about the swelling in plaintiff's leg, his size, and his decreased mobility. Plaintiff was followed with serial x-rays to see how the fracture was healing. In addition, plaintiff has received numerous, regular follow-ups for his fractured ankle (see, e.g., Def.'s Ex. A at CHM 57, 61, 68, 82, 94, 105, 114, 120, 130) and has even been referred to and seen by an outside orthopedic specialist, Dr. Shaw, on three occasions. The most recent visit [in January 2007] occurred following a request by defendant

> Johns[e]n and was scheduled earlier than recommended by Dr. Shaw himself.

*Id.* at 9. The Magistrate Judge further found that the treatment plans provided by Dr. Shaw were followed at EPCJC. *Id.* at 10. Moreover, according to Dr. Shaw's report from plaintiff's third appointment on January 11, 2007, plaintiff's fracture had healed, and Dr. Shaw "wasn't at all sure that his ankle joint was the source of" the continued problems plaintiff was having with edema (swelling) of his leg, foot, and ankle. *Id.* at 12 (citing Hrg. Ex. A at CHM 123–24). Dr. Shaw explained to plaintiff at that time that an ankle fusion was not warranted, but plaintiff "stated he only wanted his ankle fused and did not want any other intervention." *Id.* Plaintiff also "stated he was no longer interested in pursuing care with [Dr. Shaw] and would not comply with [his] recommendations," which included "a new fracture walker brace, an MRI of the entire leg, ankle and foot, and a sequential venous compression device (AV pulse) to be applied daily at the infirmary." *Id.* The Magistrate Judge further referenced Dr. Al-Abduljalil's hearing testimony that she discussed Dr. Shaw's recommendations with plaintiff, who was not interested and wanted an ankle fusion, as well as a note from Defendant Johnsen contained in plaintiff's medical records indicating that Johnsen had discussed Dr. Shaw's report with plaintiff on January 31, 2007. *Id.*

The Magistrate Judge next found plaintiff had received appropriate care after the February 11, 2007 assault. The Magistrate Judge relied in part on a nurse's note, which documented plaintiff's visit to the nurse immediately after the assault and stated there was "[s]light swelling noted to top right side back of head" and "[s]light redness,"

but plaintiff had "[n]o bleeding or bruising" and normal vitals. *Id.* at 12–13 (citing Hrg. Ex. A at CHM 178). In addition, plaintiff testified that, after the assault, he had no open wounds, was not bleeding, was conscious, knew who and where he was, could answer questions, was not vomiting, could move his arms and legs, and could walk to the clinic. *Id.* at 13. The Magistrate Judge also noted that x-rays were taken the following day and referenced the testimony of Defendant Fender and Dr. Al-Abduljalil that in their opinions plaintiff was provided appropriate care for his injury, which did not appear to be serious. *Id.* The Magistrate Judge found that plaintiff's testimony that he also complained of neck pain on the date of the assault was not credible, as such complaints were not documented in the nurse's note. *Id.*

Finally, the Magistrate Judge found that plaintiff had refused a doctor's appointment scheduled for February 12, 2007, that plaintiff had refused a follow-up visit with the doctor on March 1, 2007, and that plaintiff had submitted no further kites since March 1, 2007. *Id.* at 13–14. In light of these findings, the Magistrate Judge concluded that "plaintiff merely disagrees with the care provided and/or recommended and has thus chosen to refuse care, not submit additional 'kites' seeking medical care at the facility, and put the matter into the court's hands." *Id.* at 14.

**D. Plaintiff's Fourth Motion for Injunctive Relief**

On May 16, 2007, well after the Magistrate Judge issued his Recommendation, plaintiff filed a fourth request for injunctive relief (Dkt. # 60). In this motion, plaintiff again complains of the treatment he received for the injuries he allegedly sustained after the first assault in March 2006, including "a fractured ankle, broken nose, and loss

of eyesight, which has now caused mass disfigurement of ankle and half-closed sinus's [sic] causing problems breathing at times, [and] permanent half-black circles around eyes that are to this day soar [sic] to the touch." Pl.'s Fourth Mot. at 1. Plaintiff contends that he "was never allowed or given any professional care on any of his . . . injuries and healthcare concerns" except his ankle. *Id.* at 2. Plaintiff also complains that two of his teeth were injured during the second assault in February 2007 and that he is losing them from lack of care. *Id.* at 6.

With regard to his ankle, plaintiff states that, at his second visit to Dr. Shaw in July 2006, Dr. Shaw gave plaintiff a second walking boot and sent him to be fitted for a more permanent brace. *Id.* at 3. Plaintiff contends he was informed during the fitting that he should be seen immediately by a specialist if any irritation formed from the brace. *Id.* Plaintiff asserts he started having such problems within weeks of receiving the new brace and informed the medical staff, but did not see Dr. Shaw again until January 2007. *Id.*

Plaintiff also states that he was seen by the EPCJC doctor, Dr. Al-Abduljalil, in December 2005 for a pre-existing problem with his abdomen (a hernia), and that he was given an ace wrap and informed that he would have to have money up front to receive outside care. *Id.* at 1–2. Plaintiff saw the doctor again in March 2006 regarding the hernia and was given a second ace bandage to wrap around his abdomen. *Id.* at 4. Plaintiff asserts this was the only treatment he was given for his hernia. *Id.* Finally, plaintiff disputes the Magistrate Judge's finding that plaintiff has been refusing treatment, asserting, for example, that plaintiff was taken off his

medications between April 29, 2007 and May 10, 2007, but that his medical chart wrongly shows he refused his medications on those days. *Id.* at 6. Plaintiff reiterates his request for outside care of his various illnesses and injuries.

## II. STANDARD OF REVIEW

The Court reviews *de novo* "those portions of the report or specified findings and recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(B); F.R.Civ.P. 72(b).

## III. DISCUSSION

### A. Applicable Law

The Magistrate Judge correctly set forth the general requirements a movant must satisfy to be entitled to a preliminary injunction. Specifically, the movant must show: (1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest. *ACLU v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999) (citation omitted). As noted above, the Magistrate Judge's Recommendation is based on his conclusion that plaintiff was unable to show there is a substantial likelihood that he will ultimately prevail on the merits of his underlying claims and was thus unable to satisfy the second requirement for obtaining interim injunctive relief.

Plaintiff's claims are based on defendants' alleged violations of plaintiff's constitutional right to receive adequate medical treatment. This right arises under the

Eighth Amendment's Cruel and Unusual Punishment Clause, which prohibits officials from being deliberately indifferent to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Although pretrial detainees like plaintiff are protected under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment, courts apply an analysis identical to that applied in Eighth Amendment cases in determining whether a detainee's rights were violated. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (citing *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)).

The *Estelle* test has two components: (1) an objective component involving whether the prisoner's need was sufficiently serious, and (2) a subjective component involving whether the particular prison official's state of mind was sufficiently culpable to amount to deliberate indifference to the prisoner's medical condition. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the subjective inquiry, which is the basis of the Magistrate Judge's Recommendation and the only element of the *Estelle* test at issue here, "the prison official must have a 'sufficiently culpable state of mind.'" *Self v. Crum*, 439 F.3d 1227, 1230–31 (10th Cir.), *cert. denied*, 127 S.Ct. 131 (2006) (quoting *Farmer*, 511 U.S. at 834). That is, "a prison official cannot be liable 'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* at 1231 (quoting *Farmer*, 511 U.S. at 837). It is clearly established in the Tenth Circuit that "'a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not

state a constitutional violation' absent evidence the prison official 'knew about and disregarded a "substantial risk of harm" to [the prisoner's] health or safety.'" *Id.* (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1277 & n.7 (10th Cir. 2001) (alteration in original) (internal citation omitted)).

**B. Analysis**

Plaintiff objects to several portions of the Magistrate Judge's Recommendation, which are addressed in turn. First, plaintiff complains the Recommendation was premature because (1) plaintiff was notified of the hearing only a week before it was held, (2) plaintiff therefore had no time to subpoena witnesses, and (3) only two witnesses other than plaintiff testified at the hearing, neither of which was plaintiff's primary care provider over the relevant time period. Pl.'s Obj. at 1–2. As noted by defendants, however, it is too late for plaintiff to complain that he needed more time to prepare for the hearing. The Minute Order issued by the Magistrate Judge on March 8, 2007 (Dkt. # 49), which set the hearing on plaintiff's motions, provided that plaintiff "shall be fully prepared to submit any and all evidence and call witnesses in support of his motions." (Emphasis in original). Yet plaintiff made no written request for more time prior to the hearing, made no oral request at the hearing itself for more time, and never objected at the hearing on the basis of needing more time or additional witnesses. Nor did plaintiff make any attempt to subpoena witnesses before the hearing. Thus, plaintiff has waived his right to complain about the "limited testimony" presented at the hearing.

Plaintiff also contends, in both his objection and his fourth motion for injunctive relief, that the Magistrate Judge erred in failing to address the evidence supporting plaintiff's claims regarding the alleged lack of treatment for his hernia. Pl.'s Obj. at 2; Pl.'s Fourth Mot. at 3–4. However, plaintiff did not mention the hernia in his first three motions, and thus the Magistrate Judge appropriately did not consider it in issuing his Recommendation. Moreover, plaintiff's argument about the treatment of his hernia does not aid his ability to succeed on the merits of his deliberate indifference claims. Plaintiff acknowledges that the hernia was a pre-existing condition when he arrived at EPCJC, that accordingly he was told he would have to pay for surgery barring an emergency in accordance with EPCJC policy, and that he has been treated with ace bandages to wrap around his abdomen as a binder. Plaintiff does not contend he has submitted any kites regarding the hernia that went unanswered. Nor does plaintiff assert, and there is no indication, that his condition requires immediate surgery. Plaintiff's medical records indicate he was examined by Dr. Al-Abduljalil on May 16, 2007, at which time the hernia was "easily reduced, soft, [and] NT [non-tender]." Ex. D to Def.s' Resp. to Fourth Mot. (Dkt. # 62). Thus, plaintiff's contentions about the treatment of his hernia do not demonstrate that defendants acted with deliberate indifference toward his condition.

Next, plaintiff disputes the Magistrate Judge's reliance on certain portions of Dr. Shaw's reports because (1) plaintiff had not had an opportunity to review the reports before the hearing, (2) Dr. Shaw did not testify at the hearing, so plaintiff was not able to cross-examine him regarding the reports, and (3) the reports are hearsay. Pl.'s Obj.

at 2–3. However, plaintiff's entire medical file, which included Dr. Shaw's reports, was admitted as evidence at the hearing with no objection from plaintiff. Thus, plaintiff has waived his right to object to its admissibility.

Plaintiff also takes exception to the Magistrate Judge's finding that "[t]here is no indication in [Dr. Shaw's third] report that Dr. Shaw suggested that a second opinion be obtained." Rec. at 12. In support, plaintiff relies on the following statement in Dr. Shaw's report: "I explained that I would be happy to transfer, at no charge, copies of his records and films to whomever he designated as a treating physician." Pl.'s Obj. at 3 (citing Hrg. Ex. A at CHM 124). Read in context, however, this statement does not support plaintiff's assertion. The statement follows Dr. Shaw's discussion of plaintiff's refusal to follow his recommendations regarding plaintiff's ankle and Dr. Shaw's corresponding discharge of plaintiff from the practice. Hrg. Ex. A at CHM 123–24. An offer to transfer a patient's records to his treating physician, which a physician is ethically obligated to do, does not equate to a recommendation to obtain a second opinion. *See* AMA Code of Medical Ethics, Op. E-7.01 (issued prior to Apr. 1977) ("A physician who formerly treated a patient should not refuse for any reason to make records of that patient promptly available on request to another physician presently treating the patient."). Thus, the Court agrees with the Magistrate Judge's finding that Dr. Shaw did not recommend that plaintiff obtain a second opinion.

Plaintiff next objects to the Magistrate Judge's characterization of Dr. Al-Abduljalil's testimony that "'she discussed Dr. Shaw's recommendation with the plaintiff, but plaintiff was not interested and wanted an ankle fusion, which Dr. Shaw thought

was not warranted at that time.'" Pl.'s Obj. at 3 (quoting Rec. at 12). Plaintiff contends the medical records show that, as of the date of the hearing, Dr. Al-Abduljalil had not personally treated plaintiff since March 2006 and thus could not have discussed with plaintiff the recommendations made by Dr. Shaw in January 2007. *Id.* The Court agrees with plaintiff that the Magistrate Judge misstated Dr. Al-Abduljalil's testimony, as she did not testify that she discussed Dr. Shaw's report with plaintiff when it was received; rather, Dr. Al-Abduljalil testified that, when EPCJC received the report, she spoke with PA Johnsen about the need to discuss Dr. Shaw's recommended treatment options with plaintiff. However, this misstatement is minor, particularly given the Magistrate Judge's accurate statement that plaintiff had an appointment with PA Johnsen on January 31, 2007, during which his ankle as well as his other medical issues were discussed. Rec. at 12; Hrg. Ex. A at CHM 168. The Court finds that this minor error does not affect the accuracy of the Magistrate Judge's overall conclusions regarding the propriety of plaintiff's care.

Plaintiff next objects to the Magistrate Judge's findings regarding plaintiff's treatment after the February 11, 2007 assault. Pl.'s Obj. at 4. Specifically, plaintiff objects to the finding that plaintiff did not complain about pain in his neck or his teeth when he was seen by a nurse immediately after the assault, as such complaints were not reflected in the nurse's note. Rec. at 13. Plaintiff further objects to the Magistrate Judge's findings that plaintiff refused a previously scheduled appointment on February 12, 2007 and that plaintiff's testimony that he was unaware of the appointment until after the scheduled time was not credible. *Id.* at 13–14. Upon *de novo* review, the

Court finds that the evidence supports the Magistrate Judge's credibility determinations and his finding that plaintiff refused treatment on February 12, 2007. The Court notes that, in addition to the nurse's note, there is also no other indication in the record of any complaints by plaintiff of neck or tooth pain following the assault. Moreover, as discussed by the Magistrate Judge and undisputed by plaintiff, there is a notation in plaintiff's medical records reflecting that plaintiff again refused a follow-up appointment with medical staff on March 1, 2007. Hrg. Ex. A at CHM 174.

Finally, plaintiff objects to the Magistrate Judge's finding that x-rays were taken the day after the February 11, 2007 assault. Pl.'s Obj. at 4 (citing Rec. at 13). Defendants do not dispute that this finding was incorrect and that no x-rays were taken on February 12, 2007. However, again this minor error does not affect the Magistrate Judge's broader conclusion that plaintiff received appropriate care and treatment after the assault, which is amply supported by the evidence.

In addition to his objections to the Recommendation, plaintiff makes a new argument in his fourth motion for injunctive relief regarding his treatment after the first assault in March 2006, asserting that "[a]lthough plaintiff has been seen by outside specialists on his ankle, plaintiff was never allowed or given any professional care on any of his other injuries and healthcare concerns," which include the injuries to his face and nose. Pl.'s Fourth Mot. at 2 This argument was not raised in plaintiff's first three motions, was not considered by the Magistrate Judge, and has accordingly been waived. Moreover, the evidence shows that plaintiff's nose and eye area was x-rayed the day after the assault with normal results. Hrg. Ex. A at CHM 14. Plaintiff had a

follow-up appointment on April 26, 2006 with PA Johnsen, who noted plaintiff's vision was clear and his nose was essentially normal with the exception of some "weeping," and prescribed a nasal spray. *Id.* at CHM 37. Plaintiff submitted another kite on April 29, 2006 complaining that his "nostrils are still half closed," then refused a clinic visit on May 3, 2006, and was seen again by PA Johnsen for a follow-up on May 10, 2006. *Id.* at CHM 38, 40, 46. Although plaintiff had several subsequent follow-up visits for his ankle, there is no indication that he complained of eye or nose problems at any of these appointments, and he made no further requests for treatment for such problems. *E.g.*, *id.* at CHM 55, 57–59, 61, 64, 68. Thus, the evidence contradicts plaintiff's assertion that he did not receive treatment for his facial injuries after the March 2006 assault.

In sum, the Court agrees with the Magistrate Judge's conclusion that the evidence shows plaintiff simply disagrees with the treatment that has been provided and is refusing to follow the recommended course of treatment. The evidence does not support a finding that any EPCJC officials knew about and disregarded a substantial risk of harm to plaintiff's health or safety. Thus, plaintiff has failed to show a likelihood of success on the merits of his claims that EPCJC officials were deliberately indifferent to his serious medical needs, and plaintiff is not entitled to interim injunctive relief.

## IV. CONCLUSION

For the foregoing reasons, the Recommendation of United States Magistrate Judge (Dkt. # 55) is ACCEPTED. Plaintiff's Motions for Injunctive Relief dated February 22, 2007 (Dkt. # 42), March 1, 2007 (Dkt. # 43), March 7, 2007 (Dkt. # 47), and May 16, 2007 (Dkt. # 60) are DENIED.

DATED: August 27, 2007

BY THE COURT:

s/Phillip S. Figa
Phillip S. Figa
United States District Judge